## THE SOPHIE WILHELMINE.

### BANCA DI GENOVA v. THE SOPHIE WILHELMINE.

(Circuit Court of Appeals, Second Circuit. November 13, 1893.)

SHIPPING—BOTTOMRY—HYPOTHECATION OF FREIGHT.

A contract hypothecating "ship and freight" for a "loan on freight," assigning a proportionate part of the freight therefor, providing that "in case of total loss" the loan shall not be repaid, and expressly made subject to rules of the lender applying only to "loans on freight," one of which rules provides that "if there be no payment of freight, either total or partial," the loan shall not be repaid, is a bottomry of the freight only; and the words "total loss" refer to the loss mentioned in such rule, "if there be no payment of freight," and not to a total loss of the vessel and freight.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Libel by the Banca di Genova against the Swedish bark Sophie Wilhelmine for the enforcement of a bond given by the master of the bark for a loan, with interest and penalties stipulated in case of nonpayment. The defense was that the bond was conditioned upon the earnings of freight on the voyage then contemplated, and that no freight was earned. The district court sustained this defense, and dismissed the libel. Libelant appeals. Affirmed.

Statement by WALLACE, Circuit Judge:

On March 19, 1888, the master of the bark, which was then lying in the port of Almeria, Spain, laden with a cargo of 1180 tons of white salt, bound for New York, applied to and obtained from the libelant a loan of £149, and executed a bond therefor, with interest and penalties. The transaction is evidenced by two instruments,—the application for the loan, and the contract of repayment. These instruments were printed forms, with blanks to be filled up as to details, prepared and furnished by the libelant:

"Banca di Genova, Genoa.

"The undersigned requests a loan of one hundred and forty-nine pounds upon the freight of £482.0.0. of the Sophie Wilhelmine, tons 976, built in the year 1878, classed A1, owned by M. Engelschien, Captain S. P. Bugge, insured at Christiania for the sum of £4,000, now lying in Almeria, which will be earned as freight in a voyage from Gabo de Gate to New York, according to the annexed regulations.

"For the owner or captain, S. P. Bugge.

"Eight days after the arrival at the port of New York, or other intermediate ports at which shall end the voyage of my vessel denominated Sophie Wilhelmine, I promise to pay to the order of the Banca di Genova, of Genoa, the sum of one hundred and forty-nine pounds sterling, value received

in cash as a loan on freight for the last expenses necessary to the undertaking of the voyage from Gabo de Gate to New York; and I hereby assign therefor, to the said Banca di Genova, enough of the present freight to cover the sum of the above loan, with power to collect it when due; and I hereby hypothecate ship and freight for repayment of said loan, with priority over every other credit, and in case of total loss the amounts received as loan shall not be paid back; and I accept all the conditions set down in the regulations of the Banca di Genova relating to loans on freight, of which I received a copy.                                                    S. P. Bugge."

"Banca di Genova, Genoa.

"Rules for Loans on Freight.

"The loans which the Banca di Genova agree to make on freight must be subject to the following rules:

"(1) Any owner desirous to obtain a loan on freight from Banca di Genova must make his request in accordance with the printed form which will be given him for the purpose. The form will indicate (a) the build, name, and tonnage of the vessel; (b) the port in which she is lying, and where and how insured; (c) the voyage she is about to make; (d) the amount of freight upon which the loan is asked; (e) the amount of loan asked for; (f) the signature of owner or captain.

"(2) The board of direction authorized by two delegated administrators, according to article 28 in the statute, accept or decline the demand.

"(3) The loan can never exceed a third of the whole freight the vessel may make.

"(4) The owner or captain, before he can obtain a loan, must produce the bills of lading signed by the shipper, in proof of not having received any previous advances on the freight.

"(5) The loan must be repaid within —— days after the arrival of the ship in the port to which she is bound, or wherever the voyage may terminate, and the freight and vessel will be liable to the repayment of the loan, with priority over every other credit.

"(6) In the event of the vessel, on arrival at the port of destination, being ordered by the shipper of the cargo to any other port, the amount of the loan must be repaid to the agents of the Banca di Genova, and a further loan may be asked, which the agents have power to grant or decline.

"(7) Any captain leaving a port, in which he has to repay a loan, without having done so, will be subject to a fine of 30% upon the sum due, besides being liable for all trouble and expense caused to the Banca thereby.

"(8) If the loan be not repaid when it falls due as fixed according to article 7, the Banca will proceed to enforce payment, and will have the right to exact interest at the rate of 8 per cent. per annum until the payment is made.

"(9) A receipt will be given by the captain or owner when the loan is made, signed in accordance with the above rules, or with any others that may be established.

"(10) In the case of ships abroad, when the owner has not time to obtain the sanction of the directors of the Banca di Genova to a loan on freight, agents are authorized to grant the loan at the request of the captain, always subject to these regulations.

"(11) Loans on freight stipulated in foreign money shall be repaid at the current rate of exchange at sight at the port where the vessel discharges, or to the Banca di Genova in Genoa.

"(12) Loans shall always be exempt from any contribution to either general or particular average.

"(13) The premium and interest on the sums granted in loan on freight according to the list must be always retained on the loan itself, and in case of a total loss, if there be no payment of freight, either total or partial, the sums received as loan shall not be paid back, except that which has been taken beyond the third part of the freight.

"(14) Ships discharging in Italian and Adriatic ports shall repay the loan at the official rate current for sight bills.

"(15) The owner or captain shall not take any other advances upon the same freight at the port of loading, or, in such case, hold themselves bound to return the present loan, even though the vessel be lost.

"(16) The captain shall give immediate notice on arrival at port, discharge to the Banca di Genova in Genoa, or to their agents at the nearest port, incurring otherwise the penalty of 10% on the amount of loan."

The vessel sailed from Almeria on March 22, 1888. She had severe westerly gales in the Mediterranean, and did not pass Gibraltar till April 12th. On April 14th, in a heavy wind, the vessel sprang a leak. The pumps were kept going steadily, but the leak increased, and it became necessary to seek a port of refuge. Accordingly, on April 17th, the master directed his course to Lisbon, which was the nearest port. On the 19th they arrived there. Surveys were duly held, and in accordance therewith about 300 tons of salt was discharged, the vessel examined and repaired by a diver, the cargo reshipped; and on or about May 15th the vessel sailed from Lisbon for New York. On May 18th, when about 250 miles from Lisbon, in a heavy gale,-the vessel began to leak again. The water in the hold was increasing, and the crew insisted on returning to Lisbon. Accordingly, the vessel turned back a second time, and on the 22d arrived in Lisbon, the pumps having been going continuously for three days and nights. Assistance was obtained in Lisbon to keep the vessel afloat. Surveys were duly held by the expert surveyors of the Tribunal of Commerce, and in accordance therewith the cargo was discharged into a lighter. As the estimated cost of repairing the vessel at Lisbon exceeded three-quarters of her value, the president of the Tribunal of Commerce duly condemned the vessel as unseaworthy, according to article 1831 of the Codigo Commercial Portuguez. The master and agents of the vessel made every possible effort to forward the cargo to its destination, but could not obtain a ship to carry it on. The shippers and charterers, and their underwriters, were duly notified of the disasters, and of the steps taken by the master in pursuance of the recommendation of the surveyors. After the vessel had been condemned as unseaworthy, and had been legally separated from the cargo, she made temporary repairs, and, taking on board additional pumps and an extra crew, on or about July 19th, proceeded in ballast, at the master's risk, to Appledore, in the Bristol channel, where the vessel was thereafter repaired. The voyage was broken up without fault on the part of the vessel or her master. The vessel could not have carried the cargo from Lisbon, and, had she remained there, could not have been repaired, but must have been sold, having been condemned as unseaworthy. No freight was earned. The cargo was given to the agents of the cargo owners, who contributed 250 milreis towards the cargo's share in general average. As the cargo was of little or no value, no average adjustment was made up.

Lorenzo Ullo, for libelant.

Harrington Putnam, for claimant.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge, (after stating the facts.) If the contract was a bottomry on the freight of the vessel to be earned on her voyage from Gabo de Gate to New York, the libelant was not entitled to recover, because no freight was earned, and consequently there was a total loss of the subject of the maritime risk. It is not disputed that it was a bottomry loan. That it was so is clear, because the contract provides that "in case of total loss the amount received as loan shall not be paid back." The libelant insists that the subject of bottomry was the ship, as well as the freight, and the argument is that the words "total loss," mentioned in the hypothecation and in the rules which constitute a part of the contract, mean a total loss of the vessel and freight.

Unless it was contemplated that the freight, and the freight only, was to be the subject of bottomry, all the recitals in the application and contract of hypothecation in respect to a loan upon freight

are superfluous and meaningless. Apparently, the only object of these recitals is to distinguish the transaction from a bottomry of the ship, or of the ship and freight, and make it a bottomry of the freight alone. There is no conceivable reason why the application for the loan should have been confined to one upon freight, or why the transaction should have been denominated in the hypothecation a "loan on freight," and made subject to the "rules for loans on freight," if a bottomry upon the vessel had been in the minds of the parties. Nothing can be plainer than that they contemplated a loan in which the maritime risk was the contingency of earning freight, and a security payable only in the event of the safety of the interest pledged. A master has the same authority to hypothecate the ship that he has to hypothecate the freight. Whenever he may bottomry the one, he may the other, and the same circumstances must exist in either case to justify the security. If it had been the intention of the parties to bottomry the ship as well as the freight, there is no reason why that should not have been done, and the vessel assigned, as well as the freight, and it cannot be doubted that the intention would have been plainly expressed. It ought not to be inferred from the ambiguous terms embodied in documents prepared by the libelant.

The stipulation in the contract hypothecating "ship and freight for repayment of said loan" is not at all inconsistent with the intention to found the maritime risk upon the safety of the freight. That stipulation merely adds the security of the vessel for the performance of the bottomry contract. A bottomry bond gives no claim against the shipowner. If it bind him personally, it is not a contract of bottomry, and the lender has no insurable interest under it; and, in the absence of the express sanction of the owner, such a bond given by a master is not enforceable. But its validity is not affected by the circumstance that additional security is given for the performance of the bottomry contract.

The condition making the loan payable "eight days after the arrival at the port * * * which shall end the voyage of my vessel" is usual, whether the bottomry is on ship, freight, or cargo. Its purpose is to specify the time at which the obligation becomes payable, and when the marine interest will begin to run.

Our conclusion is that the total loss, in case of which the loan shall not be repaid, is the total loss mentioned in Rule 13, viz. "If there be no payment of freight, either total or partial, the sums received as loan shall not be paid back."

The decree is affirmed, with costs.